ALICE DWYER YOUNG, widow, v. H. H. VICTORY.

150 So. 624.
Division A.
Opinion Filed September 22, 1933.
Rehearing Denied November 13, 1933.

*J. C. Davant,* for Appellant;

*Wilson & Bogue,* for Appellee.

ELLIS, J.—On the 23rd of July, 1933, in the City of New York, twelve persons signed an instrument in writing, which they described as a "Declaration and Articles of Trust," in which it was stated that they had agreed between themselves "and with all persons who may hereafter become interested herein, and especially with all persons who may hereafter convey or deliver property of any kind or character to us or to our successors, as such" that they would, as

such Trustees, hold and administer all property of any kind that may be conveyed or delivered to them, or received by them as Trustees, in trust for the purposes thereafter set forth in the instrument.

The purposes set forth in the instrument are narrated in two articles. Article I contains two paragraphs, one declaring that the twelve signers of the instrument should be known and designated "in their collective capacity" as the Gulf Guaranteed Mortgage Bond Company, a trust estate," and that in such name "so far as convenient and practicable" they shall hold, manage, control, operate, and administer the trust estate and execute and sign all instruments. It is repeated that the name is "intended as a designation or title of the Trustees in the collective capacity in which they shall conduct the business of the said trust estate." The second paragraph provides that the title to property acquired under the declaration of trust "shall vest in and be held by the Trustees." The trust estate is referred to in the paragraph as a "common law company" and the conveyance of any property to or for the use of the trust estate shall vest the title thereof in the trustees.

Article II of the document contains thirty-seven sections in which the purposes, powers, methods of operation, rights of certificate or share holders, duration of the trust, number of "shares or units, of participative interest" and form of certificate, number of preferred shares and form of certificate are set out in full detail. Section thirty-four provides that in consideration of the fact that Edward Condon "originated the idea," formulated the "plans" for the development of the scheme and prepared the "instruments necessary for the creation, establishment, conduct and government" of the trust estate, the trustees were "empowered, authorized and instructed" to issue and deliver to Mr. Con-

don ten thousand of the twenty thousand "Common Participative Shares," which the document signed by them provided should be the total issue of such shares. The shares to be issued to Mr. Condon were to be charged to "preliminary organization account."

Section thirty-six contained provisions designed to counteract the anticipated attempts of those who might thereafter seek to defeat the purpose or work of the trust estate.

Section thirty-three attempted to vest in the trustees in their collective capacity the "powers, functions, authority and responsibility" that "inure to any natural person or individual under the common law." No money was to have been borrowed, debt incurred, obligations assumed or real property transferred except by the unanimous consent of all the "Trustees at the time in office" and the signature of each trustee was required to "make such transaction binding upon the trust estate."

No provision was made for creating an estate except by the sale of shares or units. Section thirty provided that the "trust estate, and all its property of whatever kind and wherever located, shall be represented by twenty thousand (20,000) shares or units, of participative interest." The shares would have no nominal value. The trustees were authorized to issue those certificates of participative interest "in payment for any property authorized to be purchased by the terms of this instrument at its reasonable value" or "in payment for labor performed or work done or money paid or for the purpose of developing any properties of the trust estate" or to carry on any business.

The registered shareholders constituted the *cestuis que trustent* of the estate to whom the trustees were to be in no wise "liable otherwise than as this instrument specifically"

provides, which specific liability to the beneficiaries of the trust the instrument fails to define.

Three officers were required to be chosen by the trustees for purposes which are not clearly set out in the instrument. The language of part of Section twenty-six pertaining to such officers, who were to be styled as President, a Secretary and a Treasurer and which purports to define their duties, is as follows: "The duties of the officers so elected shall be such as usually devolve upon those holding like or similar positions and as stated in this instrument."

Sections one to nine, inclusive, contain all necessary provisions for acquiring property, businesses, and leases and disposing of the same, but nowhere is any means provided for acquiring an estate except by the sale of so-called participative units or shares and preferred shares, ten thousand in number, of a par value of one hundred dollars, which latter the trustees had the power to retire in three years at not more than one hundred and ten dollars and accumulated interest.

One section, numbered twenty-five, provided that the "registered shareholders, for the time being, and no one else, shall be the *cestui que trustent* of this instrument." It is especially declared that a "trust and not a partnership is created by this instrument and that the shareholders are *cestui que trustent* only, with only such rights as are conferred upon them as such *cestui que trustent* hereunder, and neither the trustees nor the shareholders, nor any of them, shall be deemed in any way liable or otherwise than as in this instrument specially provided."

Section nineteen however provides that "no shareholder or security-owner of this trust estate shall have any title, legal or equitable, in or to the trust estate, real or personal, at any time held by the Trustees, or in or to any part there-

of." The trustees were to "take and hold the title, both legal and equitable, to all property conveyed or delivered to or held by them and included in the trust estate."

So by that instrument the signers sought to create a "trust estate" without any estate or property of any character, nor with any money with which to acquire an estate except by the sale of twenty thousand "participative units or shares" of no par value and ten thousand "preferred shares" of one hundred dollars each par value. A trust in which the trustees were to hold both legal and equitable title to all property acquired, and in which the shareholders, called the *"cestui que trustent,"* should have no interest legal or equitable whatsoever in the property to be acquired nor the money or property with which they may have purchased the shares held by them. An arrangement by which one-half of the total number of shares to be sold with which to create an "estate" was to have been given over to the originator and designor of that particular brand of pseudo-finance, so that an "investment" by a person foolish enough to put his money into it became immediately, upon the payment of his money or property over to trustees for any number of shares of the participative variety which the trustees might deliver for the money paid or the property conveyed, worth less to the investor than fifty per cent of the value of the money paid or property conveyed.

After operating in this State under authority of certain State officials designated by Chapter 9125, Laws of 1923, for a period of about four years, during which unearned dividends were paid to some shareholders, the "trust estate" was "dissolved and terminated" by order of the Circuit Judge of the Sixth Judicial Circuit for Pinellas County and Wm. G. King was appointed receiver for the "purpose of liquidating and winding up the affairs of said association."

That order was made in a suit by the American Bank & Trust Company as executor of the will of Mary D. Taylor against William W. Bailey and other signers of the "trust" agreement and dated July 17th, 1928.

Chapter 9125, Laws of Florida, *supra,* was approved by the Governor June 7th, 1923, and became effective, by special provision, July 1st, 1923. Twenty-two days afterwards the so-called "trust estate" was attempted to be formed by the signing of the instrument mentioned, in New York City.

Chapter 9125, *supra,* provides that all persons seeking to transact business in this State under such an agreement known as a "Declaration of Trust" shall file in the office of the Secretary of State a true and correct copy of the "Declaration of Trust" under which the business is proposed to be conducted and that a fee of one hundred and fifty dollars shall be paid as a filing fee and transmitted to the State Treasurer. See Sec. 2.

Section 3 provides that before any "organization or person shall offer for sale, barter or sell any units, shares of stock, notes, bonds, mortgages or other securities of an organization doing business under what is known as a 'Declaration of Trust' in the State of Florida, such organization, person or persons shall procure from the Comptroller and the Attorney General of the State of Florida, acting as the Investment Company Board of The State of Florida, a permit to offer for sale and sell such securities, which permit shall be applied for and granted under the same conditions that like permits are applied for and granted to corporations." Section 4 provides a penalty for violating any provisions of the Act. The offense is denounced as a felony.

The signers of the declaration of trust deposited a copy of the document with the Secretary of State and paid the

filing fee of $150.00 and obtained from the Secretary of State, on April 3rd, 1924, his certificate to that effect.

Mrs. Taylor, at the suit of whose executor the Trust Estate was dissolved, was the owner of 1064 participative or common shares or units and 1064 preferred shares.

Prior to obtaining the certificate from the Secretary of State, however, the "Gulf Guaranteed Mortgage Bond Company, a Trust Estate" in that name acquired from Mrs. Alice Dwyer Young, a widow, the appellant in this case, a mortgage upon certain property in St. Petersburg described in the "North forty (N 40) feet of the South half (S½) of Lots Fifteen (15) and Sixteen (16) in Block Eleven (11) of the Revised Plat of St. Petersburg," etc. The alleged consideration for the mortgage being to afford security for debt of $18,000.00 due by Mrs. Young to the Company and evidenced by her promissory note dated March 11th, 1924; and payable three years after date. The mortgage contained the usual provisions requiring the payment of taxes and the insurance of the buildings located on the land. The debt bore 8 per cent interest from date payable semi-annually.

The case was presented in such a way and the record prepared in such manner as to make it exceedingly difficult to prepare a succinct and clear statement of the details of this transaction and the equities involved in the suit brought by Mr. Victory against Mrs. Young to enforce a mortgage given by Mrs. Young on December 10th, 1927, to the Gulf Guaranteed Mortgage Bond Company, a Trust Estate, in lieu of the first mortgage given by her on March 11th, 1924.

As nearly as can be gathered from within the "four corners" of the transcript of the record in this case, Mrs. Young was introduced to Mr. Condon, who was not one of the signers of the document but who was rewarded so

liberally for his idea and services in preparing the instrument, by her "Pastor," a clerical gentleman named Garrison, who advised her to purchase shares in the "Trust Estate" through Mr. Condon, represented by Mr. Garrison to be a brilliant man and honest, for which service, according to Mrs. Young, the Reverend Mr. Garrison received $3,000.00 commission. A man named W. J. Garrison was one of the signers of the declaration of trust and therefore one of the trustees. Whether he was the same person referred to by Mrs. Young as "My pastor, Reverend Mr. Garrison" is not disclosed by the record.

According to the answer of Mrs. Young, the first mortgage was given to secure the price of one hundred participative units or shares and one hundred preferred shares and a lot in an enterprise represented by Mr. Condon to be in process of development by him in which as a special favor to Mrs. Young he was letting her participate. For this privilege she was to have paid $5,000.00.

Three checks were drawn by the "Company" on the First National Bank of St. Petersburg in favor of Mrs. Young, as follows: One for $10,000.00, one for $3,000.00 and one for $5,000.00, which were immediately endorsed by her, retained by the "Company" and never delivered to her nor ever presented for payment. Mrs. Young thereupon executed her promissory note for $18,000.00 and the mortgage to secure its payment and she became by this transaction the owner of one hundred shares of common and one hundred shares of preferred stock, units, interests, or whatever, if anything, they represented, and the title to a lot in Mr. Condon's enterprise which seemed never to have developed.

In due course the note became due and to December, 1927, she had paid on account of interest and principal $5,285.00.

Proceedings were then begun to foreclose the mortgage. Before a decree was entered, Mrs. Young was persuaded to execute another mortgage in place of the first in the sum of $18,350.00. The mortgage covered the same land as the first and was in renewal of the first, also two lots numbered four and seven in Block E of Crescent Park Heights Subdivision to the City of St. Petersburg. Those two lots she reconveyed to the receiver of the trust estate and received therefor a credit of five thousand dollars on the second mortgage. The second mortgage was dated December 9, 1927. About seven months before the Honorable John U. Bird, Judge of the Circuit Court, signed the order in the case of the American Bank & Trust Company as executor of the will of Mrs. Taylor v. Wm. W. Bailey and others, trustees, dissolving the "Trust Estate" and appointing Judge Wm. G. King as receiver.

Then in October, 1930, Judge Bird entered another order in that case directing the receiver to sell to H. W. Victory that "certain promissory note listed in the schedule of assets as being G-199" for the sum of seven thousand dollars in cash. The receiver was directed to deliver the note and execute a proper assignment of the mortgage upon receipt of the money.

Now Mr. Victory on October 25th, 1930, exhibited his bill in the Circuit Court for Pinellas County to enforce that mortgage against Mrs. Alice Dwyer Young. The prayer is that Mrs. Young be required to pay the amount appearing to be due on the note and mortgage and in default thereof that the property, which is the same as that described in the first mortgage, be sold.

Mrs. Young answered the bill after a demurrer to it had been overruled. Testimony was taken and the Master reported his findings for the complainant. There was a final

decree in favor of the complainant from which Mrs. Young appealed.

The note was endorsed to Mr. Victory without recourse on the receiver of the trust estate. The transfer occurred before the maturity of the note. The mortgage, which was assigned to Mr. Victory at the same time, however, contained a clause that the mortgage was executed in renewal of a certain mortgage existing between the parties and dated March 11th, 1924.

The Master's report stated that Mr. Victory became the *bona fide* owner and holder of the said mortgage as of the date of the said indorsement and assignment, namely, June 3rd, 1930, and "that the complainant succeeded to all of the rights and privileges in connection with the said mortgage of the said Receiver and of the Gulf Guaranteed Mortgage Bond Company before him." The Master also found that the court's order authorizing the receiver to sell the note and mortgage to Mr. Victory, together with the endorsement of the note and assignment of the mortgage, vested title to the note and mortgage in Mr. Victory on June 3rd, 1930, and that the complainant was therefore the owner and holder of the note and mortgage at the time of the filing of the bill of complaint.

The final decree confirmed the report of the Master.

If Mr. Victory's acquisition of the note and mortgage in the circumstances constituted him a holder in due course of the promissory note under the negotiable-instrument law, Mrs. Young's defense would seem to be of no merit. The circumstances may be summarized as follows: First, the note was acquired before maturity; second, the consideration paid was about 50 per cent of its' face value; third, it was payable to the order of no natural or artificial person but to a name adopted by certain persons calling them-

selves trustees who disclaimed any personal liability; fourth, the note was signed by an order of court in a cause in which the court had decreed the dissolution of the so-called "Trust Estate" and appointed a receiver to liquidate its affairs; fifth, the order authorizing the sale of the note and mortgage, which was made June 3rd, 1930, but not entered, did not specifically identify them as a note and mortgage executed by Mrs. Young, but they were referred to as assets listed as G-199; sixth, some time after the transaction and about October 21st, 1930, four days before the filing of the bill in this case, a so-called *"nunc pro tunc"* order was made by the court directing the clerk to enter the order as originally made but which had been lost or mislaid and not entered, such latter order however did not more specifically identify the note and mortgage as instruments executed by Mrs. Young; seventh, the note indorsed by the receiver bore a qualified indorsement as it was endorsed "without recourse on me or the estate for which I am Receiver"; eighth, the endorsement was actually made about June 29th, 1930; ninth, the order authorizing the receiver to sell the note and mortgage, assuming that in such order the documents were sufficiently identified, was not entered until October 21st, 1930; tenth, there has been no endorsement of the note by the receiver after the order was recorded; eleventh, for the purpose of determining whether the transferee is a holder in due course the negotiation of the instrument takes effect as of the time when the indorsement is actually made. See Sec. 6808, C. G. L., 1927.

The statutes of this State provide that no process shall be issued or other proceedings had on any final decree or order until the same shall have been signed and recorded. Sec. 4948, C. G. L., 1927.

In the case of Thompkins v. Thompkins, 93 Fla. 844, 122

South. Rep. 766, this Court held that an order appointing a special master was required by the statute to be recorded before the Master was empowered to proceed with the taking of the testimony and that the testimony taken by him before the order appointing him was recorded was without authority of law and not entitled to consideration by the court as a basis for a final decree. See also Fiehe v. Householder Co., 98 Fla. 627, 125 South. Rep. 2.

In the latter case this Court, construing the statute referred to above, then Section 1448 Rev. St., 1892, applied it to an order appointing a guardian, and held the statute to be mandatory as applied to such an order, citing Grimsley v. Rosenberg, 94 Fla. 673, 114 South. Rep. 553. In the Fiehe case, *supra,* the order appointing the guardian was not recorded. The guardian however proceeded to dispose of property belonging to the ward, who was an insane person. A *nunc pro tunc* order was made many years afterwards requiring the order to be recorded as of the date it was made. The court on the first hearing held that the *nunc pro tunc* order was ineffective to give life and effectiveness to the transactions of the guardian. Justices BROWN and STRUM dissented.

Upon rehearing Mr. Justice STRUM wrote the opinion in which he pointed out that the order appointing the guardian was *"actually filed* in the office of the Clerk on the date the order was signed by the judge" (italics mine) ; that the failure to record it was a mere clerical misprison which it was within the province of a *nunc pro tunc* order to correct.

There is nothing appearing in this record however which shows that the order authorizing the receiver to sell certain assets of the Trust Estate, and dated June 3rd, 1930, was ever *filed* in the office of the clerk. It does not appear therefore that the failure to record the order was a mere "clerical

misprison" of the clerk. Non constat but the person obtaining the order withheld it from the files for some purpose of his own, or through carelessness misplaced it, and never presented it for filing and record and the same was never received by the clerk. If such was the case, the *nunc pro tunc* order could not have a retroactive effect nor would the recording of the order have such effect.

The holding of the court in the second hearing in the case of Fiehe v. Householder Company, *supra,* is consistent with the doctrine that where a document or court order which may be or is entitled to record is actually delivered to the recording officer to be recorded, the delivery to him of the document or order signed by the judge is *ipso facto* a filing of the order; the file mark being mere evidence of the filing. When delivered to the clerk for record the document is then in his possession as a court record and his misprison should not be visited upon those whose duty required nothing further of them than what they actually did.

It cannot be said, however, that a written order signed by the Chancellor upon the application of a party becomes in any sense a court record if the person obtaining the order and for whose benefit it was made does not deliver it to the clerk to be filed but on the contrary either negligently or by design destroys it.

The *nunc pro tunc* order therefore did not have the effect of validating the indorsement of the note by the receiver as of June 29th, 1930, nor did it have the effect of authorizing the receiver to sell the note and mortgage as of the date the order was signed. Whether it had the effect of imparting validity to the indorsement as of the date the *nunc pro tunc* order was signed and recorded, it is unnecessary to determine because on that date the record discloses that Mr. Victory had become aware of the existence of equities be-

tween the parties and the fraudulent transactions of which Mrs. Young had been the victim.

Mr. Victory was not a holder of the note in due course under the negotiable-instruments law. See Sec. 6811, C. G. L., 1927. He obtained the note at a judicial sale. The maker was in default in the payment of interest, the price he paid being about 50 per cent of the face value. The order authorizing the receiver to sell had not been recorded. The note purported to be the property of a bankrupt and defunct organization. All these facts challenge the assumption that he had no notice of any infirmity in the instrument.

While to constitute a holder of a promissory note a "holder in due course" under the statute it may not be necessary that the transfer to him should have been in the "regular course of business," yet it has been held in many jurisdictions construing the Uniform Negotiable Instruments Act, the provisions of which defining a holder in due course are the same as those of Section 6811, C. G. L., *supra,* that the purchaser from a bank commissioner of the assets of an insolvent bank is not a holder in due course, see Ward v. Oklahoma State Bank, 51 Oklahoma 193, 151 Pac. Rep. 852; that a purchaser at a receiver's sale takes subject to all defenses. See Collis v. Kraft, 118 Kan. 531, 255 Pac. Rep. 862. Some courts hold that the question whether the holder of a note is a holder in due course is one for determination by the jury. Commonwealth Banking & Trust Co. v. Smith & Oby Co., 119 Ohio St., 516, 164 N. E. Rep. 751. Others hold it to be a question of law. Arnd v. Heckert, 108 Md. 300, 70 Atl. Rep. 416. Whether the common law rule defining a holder in due course to be one who acquired it in due course of business has been eliminated by the Uniform Negotiable Instruments Act is doubtful. See

Drumm Const. Co. v. Forbes, 305 Ill. 303, 137 N. E. Rep. 225.

The receiver, Judge King, was not a holder of the note in due course. He stood in the shoes of the payee of the note, assuming that the trustees of the so-called Trust Estate could take the note payable to the trade name of the Estate. As heretofore mentioned, the Master in his report, which was confirmed by the court, stated that he found Mr. Victory "succeeded to all the rights and privileges in connection with the said mortgage of the said Receiver and of the Gulf Guaranteed Mortgage Bond Company before him," but makes no finding that Mr. Victory was a holder of the note in due course. As to the Master's report that Mr. Victory succeeded to the rights and privileges of the receiver and the Gulf Mortgage Bond Company in relation to the mortgage we agree, and that Mr. Victory's rights as to the mortgage and the privileges thereunder are the same and no greater than were the receiver's or that of the Trust Estate. As to the note which he acquired, his right to enforce the payment of it in this proceeding is the same and no greater than that of the so-called Trust Estate. He is not in the circumstances a holder of the note in due course, nor in the due course of business within the meaning of Sec. 6811, C. G. L., *supra*.

The demurrer to that part of the bill alleging the complainant's right to enforce the mortgage was overruled. That order is attacked as an error. The demurrer should have been sustained because the bill and exhibits show that the order authorizing Judge King, as receiver, to sell the note to the complainant had not been recorded when the receiver undertook the transfer of the documents to the complainant and that there has been no transfer of them since the entry of the *nunc pro tunc* order which, as pointed

out heretofore, could not impart validity to the receiver's act in transferring the note and the mortgage under the order of June 3rd, 1930, which the bill does not allege had ever been received by the Clerk nor even an attempt made to deliver it to him for record.

There is also a variance between the allegations of the bill as to who constituted the trustees of the Estate and the signatures to the declaration to trust which is made a part of the bill of complaint. There is likewise the same difference between the names set forth in the certificates by the Secretary of State and those appearing as signers of the declaration of trust. The bill names L. J. Richards and ten others as the persons who filed the declaration and were members of the association, but Richards' name does not appear among the signatures of the trustees. The names of W. J. Garrison and William P. Bird do appear as signed to the declaration, which declares that those whose names so appear shall be the trustees, while the bill omits their names as being members of the association.

In the absence of any explanation of this discrepancy in the personnel of the trustees a doubt is injected into the case as to the authority of the persons named in the bill to conduct the business described in the declaration of trust.

Mrs. Young answered the bill in which she challenged the authority of the persons named as trustees of the Estate to sell the certificates of shares or units, set up the fraud perpetrated on her and in detail the transaction by which the so-called Trust Estate acquired the mortgage upon her property, and laid the ground in her answer for evidence in support of her claim that the mortgage held by the complainant was void and that she was entitled to some affirmative relief to consist of a judgment decree in her favor for

the actual money which she had been induced to pay upon the alleged indebtedness.

A demurrer to the averments made as a basis for the affirmative relief was sustained. That order was also erroneous. The defendant was entitled to a refund of the money obtained from her in the continuous and systematic execution of the original fraud perpetrated upon her.

An action for money had and received would lie in her favor for the money received under a void authority, or where it was paid where there was no ground in conscience to claim it of her. 1 Archbold's Nisi Prius 269; Cullen v. Seaboard Air Line R. Co., 63 Fla. 122, 58 South. Rep. 182; St. Johns Electric Co. v. City of St. Augustine, 81 Fla. 588, 88 South. Rep. 378; Love v. Brown Dev. Co., 100 Fla. 1373, 131 South. Rep. 144; Citizens' Bank of Ft. Myers v. First Natl. Bank of Waynesboro, 101 Fla. 908, 132 South. Rep. 478.

This doctrine is fully recognized in this State. Mr. Justice BUFORD, speaking for the Court in the last cited case, citing many cases, stated in the second head-note that "such a count has been likened to a bill in equity, and may, in general, be proven by any legal evidence, showing that the defendant has possession of the money of the plaintiff which in equity and good conscience he ought to pay over." In the third head-note he stated that the claim "is applicable in all cases where the defendant has obtained money which, *ex aequo et bono,* he ought to refund."

The complainant acquired, or attempted to do so, the note and mortgage and seeks in this proceeding to enforce the mortgage demanding the full face value of the note less that part of it represented by the purchase of two lots which were reconveyed to the original holders of the note and so much of the transaction is therefore eliminated from the

case, but the plaintiff acquired the note and mortgage, if at all, under the rule of *caveat emptor*. Neale v. Head, 133 Cal. 42, 65 Pac. Rep. 131.

Assuming that the complainant acquired the note and mortgage, he did so subject to all the equities existing between the original parties which go to the validity of the note and the mortgage which was a mere incident to the alleged debt. Such equities are matters within the range of fraud, mistake, want or failure of consideration, release or anything which goes' to show that the maker ought never to be compelled to pay the note to the person to whom it was originally given. See Coffin v. Talbot, 110 Fla. 131, 148 South. Rep. 184. The defendant laid the basis for such relief in the amendment to the answer, a demurrer to which was sustained.

The transaction between Mrs. Young and the trustees of the alleged Trust Estate was so charged with fraud, lack of legal authority and false representations, made through their agencies Garrison and Condon, as well as by their own pretenses and misrepresentations, as not only to invalidate the note and mortgage but also to establish a total lack of consideration thereof.

The devious method pursued to give the transaction the appearance of a loan were the mere pretense and deception. The checks on the bank, although drawn in favor of the promisor were in fact never delivered to her. They were drawn in her presence, and by her in the presence of the maker endorsed back to the maker, and never presented for payment, nor cashed, nor the money delivered to her. It was a superficial and thinly-veiled pretense to cover the illegal selling to Mrs. Young of shares or units in the socalled "Trust Estate," which the trustees had no authority from the Attorney General and Comptroller under the terms

of Chapter 9125, *supra,* to sell. There is in the record no evidence of such authority. The attempted sale of the shares therefore in the absence of such authority was not only unauthorized but a violation of the law and a crime under the statute. The transaction, in the last analysis, was a mere attempted sale of shares in the so-called "Trust Estate" as a consideration for the note and mortgage by Mrs. Young. At any price fixed for them, they were immediately upon the completion of the transaction of less value than 50 per cent of the amount agreed to be paid.

The entire scheme devised by the framers of the so-called enterprise appeared to be an unstable and visionary one in which the hope was held out to the prospective investors that there would be, for some unaccountable reason not explainable in sound economical theories or safe business transactions, a sudden and anomalistic, eccentric increase in the value of the properties to be acquired by the trustees through the abstruse, mysterious power of their personalities or business acumen.

Mrs. Young, a widow, under the influence of her "Pastor," who, according to her testimony, had his thoughts upon the consideration of a reward of $3,000.00 for bringing her under the spell of the trustees and of the alluring promises of Mr. Condon, who by the terms of the trust instrument was paid one-half of the total issue of participative shares for his services in preparing the instrument, proved to be as ignorant and gullible as could be desired in a victim of such an enterprise. She obtained nothing of value in exchange for the note and mortgage except two lots listed at $5,000.00 and which was included as an item in a separate enterprise of Mr. Condon, which disappeared as quickly as it was born, and which item was eliminated from the

principal transaction by a conveyance of the property to the "Estate" and a credit entered on the so-called debt.

Mrs. Young paid interest on the note, received from the "Estate" some money by way of dividends, which were in fact not dividends upon investments at all but apparently paid out of the properties and moneys acquired from others in further illegal sales of shares. The renewal of the mortgage and note by other like instruments but in still a greater sum, which latter instruments constitute the foundation of this suit, was but a continuation of the original fraud and had no consideration in fact nor obligation in law to support it.

. In this view of the case the findings of the master were unjustified by the evidence, and the decree of the court based upon the pleadings, evidence and master's report, erroneous. So the decree is reversed with directions to enter such orders and decrees in the cause as may be necessary to an annulment of the note and mortgage.

So ordered.

DAVIS, C. J., and WHITFIELD, TERRELL and BUFORD, J. J., concur.

. BROWN, J., not participating.